**Lawson F. BERNSTEIN, Trustee in Bankruptcy of Frigitemp Corporation, Plaintiff,**

**v.**

**IDT CORPORATION, George Davis, General Dynamics Corporation, Panagiotis Takis Veliotis, James H. Gilliland, Paulette Veliotis, Elizabeth Gilliland, Lenora L. Cable, a/k/a Lenora Davis, Mark J. Deroche and John Doe Defendants whose identities are currently unknown to plaintiff, Defendants,**

**Gerald E. Lee, Additional Defendant on the Counterclaims.**

**No. 84 Civ. 5299.**

United States District Court, S.D. New York.

June 27, 1986.

Lawson Bernstein, Bernstein Obstfeld & Schwed, New York City, David Berger, H. Laddie Montague, Jr., Martin I. Twersky, Berger & Montague, Philadelphia, Pa., for plaintiff.

Matthew L. Byrne, Daniel P. Hollman, Hollman & Byrne, New York City, for defendants IDT Corp., George Davis and Lenora L. Cable, a/k/a Lenora Davis.

Robert I. Edlitz, Gubman Sitomer Goldfaden & Edlitz, P.C., New York City, Albert E. Jenner, Jr., Nicholas D. Chabraja, William P. Suriano, Susan B. Cohen, Jenner & Block, Chicago, Ill., for defendant General Dynamics Corp.

John H. Gross, Deborah A. Swindells, Anderson, Russell, Kill & Olick, New York City, for defendants Panagiotis Takis Veliotis and Paulette Veliotis.

Edward Brodsky, Richard P. Swanson, Lawrence R. Gelber, Spengler Carlson Gubar Brodsky & Frischling, New York City, for defendants James H. Gilliland and Elizabeth Gilliland.

Louis C. Pulvermacher, New York City, for additional defendant on counterclaim Gerald E. Lee.

## OPINION

EDWARD WEINFELD, District Judge.

Plaintiff, the trustee in bankruptcy of the Frigitemp Corporation ("the Trustee"), moves for the entry of findings of fact as against defendant George Davis based upon collateral estoppel by reason of his prior criminal conviction in *United States v. Davis.*[1] The majority of plaintiff's proposed findings of fact have been stipulated by Davis; the Court now disposes of the remaining items in dispute. In addition, the Trustee moves for the establishment of the authenticity of certain Swiss banking records and other documents admitted into evidence at Davis's criminal trial.

### COLLATERAL ESTOPPEL

(a) This civil action.

The Trustee's complaint charges George Davis and others, including General Dy-

---

1. 83 Cr. 551 (S.D.N.Y.), *aff'd,* 767 F.2d 1025 (2d Cir.1985).

namics Corporation and the IDT Corporation, engaged in a conspiracy and pattern of racketeering activity to extort multi-million dollar kickbacks from Frigitemp Corporation by making payments to officials of named defendant corporations in return for the approval of subcontracts awarded to Frigitemp. The complaint alleges that as the result of payments of further bribes, defendants fraudulently transferred the subcontracts from Frigitemp to defendant IDT Corporation, a new company established and controlled by Davis and other former Frigitemp employees. These transactions, the complaint alleges, were concealed from the Trustee by a pattern of bankruptcy fraud, including perjurious statements made at depositions conducted by the Trustee pursuant to the Bankruptcy Rules and in furtherance of a conspiracy to obtain a settlement and release by the plaintiff Trustee of certain defendants and approval of the settlement and release by the Bankruptcy Court.

(b) The criminal prosecution.

The indictment upon which Davis was convicted charged Davis and three codefendants with conspiracy to defraud and conspiracy to violate the Racketeer Influenced and Corrupt Organizations Act ("RICO"), and the commission of alleged predicate offenses of mail and wire fraud, interstate transportation of stolen property, and bankruptcy fraud in connection with the same transactions. The civil complaint parallels many of the allegations in the indictment and the facts which the Trustee seeks to establish as against Davis by collateral estoppel set forth the underlying scheme to bribe employees of General Dynamics, including the mechanism of the scheme, and the diversion by Davis of substantial sums into his own hands.

Under the concept of collateral estoppel the Trustee seeks to preclude Davis from denying, in this civil litigation, issues of fact which the Trustee contends were established in the prior criminal prosecution against Davis to which the Trustee obviously was not a party. As the Supreme Court has noted, it is a settled principle that under collateral estoppel, "once an issue is *actually* and *necessarily* determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation."[2]

The Supreme Court has further noted, "[i]n the case of a criminal conviction based on a jury verdict of guilty, issues which were essential to the verdict must be regarded as having been determined by the judgment."[3] Accordingly, with respect to each of the Trustee's proposed findings, his burden is to show that the facts asserted were *necessarily* found by the jury which convicted Davis. It is of course true that "[a] general verdict of the jury ... without special findings does not indicate" which of the factual contentions alleged in the indictment or contained in the trial record were determined by the jury or the fact finder; "[u]nder these circumstances what was decided by the criminal judgment must be determined ... upon an examination of the record, including the pleadings, the evidence submitted, the instructions under which the jury arrived at its verdict, and any opinions of the courts."[4]

In accordance with the teaching of the *Emich* case, the Court has reviewed

---

**2.** *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979) (emphasis supplied). *See also Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1979); *Commissioner v. Sunnen,* 333 U.S. 591, 598–602, 68 S.Ct. 715, 719–721, 92 L.Ed. 898 (1948); *RX Data Corp. v. Department of Social Services,* 684 F.2d 192, 197 (2d Cir.1982); *Winters v. Lavine,* 574 F.2d 46, 56 (2d Cir.1978).

**3.** *Emich Motors Corp. v. General Motors Corp.,* 340 U.S. 558, 569, 71 S.Ct. 408, 414, 95 L.Ed. 534 (1951). The Trustee, although not a party to the prior criminal proceedings, may assert a "nonmutual" estoppel subject to the broad discretion of the Court. *Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979).

**4.** *Emich Motors,* 340 U.S. at 569, 71 S.Ct. at 414.

the indictment in *United States v. George G. Davis et al.,* the opinion of our Court of Appeals affirming the conviction, the instructions to the jury and relevant portions of the trial record and the briefs submitted by the parties.[5] On the basis of its study of these materials, the Court resolves the parties' Disputed Findings of Fact as indicated by either "sustained or overruled" in the margin of instant application for collateral estoppel. Those rulings shall be deemed the Court's order on this branch of the plaintiff Trustee's application.

## AUTHENTICITY OF DOCUMENTS

The Trustee also moves for an order that (a) certain Swiss bank records, produced by the Swiss Government pursuant to the Treaty between the United States and Switzerland on Mutual Assistance in Criminal Matters[6] and admitted into evidence at the criminal trial of George Davis are authentic business records as defined in Fed. R.Evid. 803(6) and 901; (b) that all other documents admitted into evidence in Davis's trial are authentic business records meeting the criteria of the referred to Rules in the absence of specific objection by any defendant within twenty days.

The Federal Rules of Civil Procedure establish a mechanism for the efficient authentication of documents during the process of discovery. Rule 36 provides that:

> A party may serve upon any other party a written request for the admission, for purposes of the pending action only, of the truth of any matters ... set forth in the request that relate to statements or opinions of fact or of the application of law to fact, including the genuineness of any documents described in the request. Copies of documents shall be served with the request unless they have been or are otherwise furnished or made available for inspection and copying. ... A party

who considers that a matter of which an admission has been requested presents a genuine issue for trial may not, on that ground alone, object to the request; he may, subject to the provisions of Rule 37(c), deny the matter or set forth reasons why he cannot admit or deny it.

Rule 37(c) provides for the payment of expenses and fees to the requesting party when the other side fails to admit the genuineness of any document or the truth of any matter requested under Rule 36 and the requesting party thereafter has established the genuineness of the document or the truth of the matter.

One objection to the authenticity of the Swiss bank records has been fully briefed by the parties, and may be disposed of on this application. Defendants Davis, Pangiotis and Paulette Veliotis, and James and Elizabeth Gilliland object to the pretrial determination of the authenticity of these documents on the ground that the documents were determined to be authentic by the Swiss Government under ex parte procedures pursuant to the Treaty on Mutual Assistance in Criminal Matters that allegedly denied them an opportunity to be heard, and on the further ground that the Treaty bars the use of such documents in civil, as opposed to criminal, proceedings.

Both of these arguments are without substance. Our Court of Appeals in upholding Davis's conviction specifically held that Davis and the other individuals have no standing to raise purported violations of this Treaty or the procedures established thereunder, except with respect to certain enumerated paragraphs of the Treaty.[7] The issue of notice prior to authentication hearings under the Treaty was raised by Davis on appeal and our Court of Appeals then stated: "[t]hat Davis has no standing to raise a purported violation of Article 18,

---

5. Defendant General Dynamics Corporation has submitted a memorandum in opposition to the entry of all of the proposed findings of fact which are in dispute. The Trustee's assertion of collateral estoppel is sought as against defendant George Davis only. General Dynamics was not a defendant in the criminal proceeding in which Davis was convicted, and no issues of fact were conclusively determined *as to it* in that

proceeding. Accordingly, General Dynamics lacks standing to enter objections on the present motion.

6. Treaty of May 25, 1973, 27 U.S.T. 2019, T.I.A.S. No. 8302.

7. *United States v. Davis,* 767 F.2d 1025, 1029 (2d Cir.1985).

**920**

Paragraph 5 of the Treaty [providing for authentication] in this context is made absolutely clear by both the interpretive letters signed by the United States and Switzerland and by the Technical Analysis of the Treaty." [8] The *Davis* decision directly controls the disposition of the objection by the Veliotises and the Gilliland's as to authentication here.

■ The argument that use of these documents in civil proceedings would violate the Treaty is similarly without substance. The Treaty specifically provides in Article 7, ¶ 3(a) that "Nothing in this Treaty shall be deemed to prohibit governmental authorities in the requesting State from ... using the materials [produced] in any investigation or proceeding concerning the civil damages connected with an investigation or proceeding for which assistance has been granted." The Swiss authorities, upon protest by defendant James Gilliland, have made a determination that an American Trustee in Bankruptcy is a governmental authority within the meaning of Article 7, ¶ 3(a).[9] Article 37 of the Treaty provides that:

> The existence of restrictions in this Treaty shall not give rise to a right on the part of any person to take any action in the United States to suppress or exclude any evidence or to obtain other judicial relief in connection with requests under this Treaty, except with respect to paragraph 2 of Article 9; paragraph 1 of Article 10; Article 13; paragraph 7 of Article 18; paragraph 1 of Article 25; and Articles 26 and 27.

Under these circumstances, the interpretation of Article 7 given by the Swiss authorities charged with the administration of the Treaty in Switzerland, and made at the request of one of the defendants now raising the objection here, is controlling and not reviewable in this Court. The objections to the authentication of the doc-

uments at issue based upon the Treaty are overruled. Any other reasonable basis for objection may be offered in response to plaintiff's requests for admissions, subject to the provisions of Rule 37(c).

Davis's further objection to the production of the Cayman Island Banking records advanced on his criminal trial when he was ordered by the trial judge to discontinue various lawsuits instituted by him in the Cayman Island courts designed to prevent the production of the records for use at his trial and his further objection on Fifth Amendment grounds were overruled by the Court of Appeals.[10]

All defendants other than George Davis object that, with the exception of the Swiss and Cayman Island bank records, they have not been provided with copies of the exhibits at Davis's trial as to which authentication is sought and therefore unable to ascertain whether the exhibits are in fact authentic business records. The Court perceives no justification for departing from the procedure set forth in Rules 36 and 37(c). With respect to all documents covered by plaintiff's motion, the Court gives plaintiff leave to serve, within twenty days, one set of requests for admission pursuant to Rule 36 directed to the authenticity of documents.

So ordered.

{Disposition as indicated, which constitutes the Court's ruling referred to in the opinion dated this day June 27, 1986.} [†]

CERTIFICATION OF COUNSEL OF DISPUTED FINDINGS OF FACT PROPOSED IN PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT BASED UPON COLLATERAL ESTOPPEL AGAINST DEFENDANT GEORGE DAVIS

The following Findings of Fact proposed by plaintiff in conjunction with his motion

---

**8.** *Id. See also United States v. Johnpoll,* 739 F.2d 702, 714 (2d Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 571, 83 L.Ed.2d 511 (1984).

**9.** *See* Decision of March 27, 1985, Federal Department of Justice and Police, Exhibit D to Affidavit of Richard Swanson.

**10.** *United States v. Davis,* 767 F.2d 1025, 1032–1040 (2d Cir.1985).

† Editors Note: The material within braces is Judge Weinstein's ruling on the disputed matter. The rulings were written on the margin of the original copy.

for summary judgment based upon collateral estoppel against George Davis are objected to by defendant George Davis. Where only limited specific language is objected to, that language appears in brackets "[ ]". Where an objection to specific language was raised by defendant Davis subsequent to the hearing before this Court on October 1, 1985, the objected to language is underlined as well as bracketed.

The disputed proposed findings of fact are as follows [numbers refer to the findings as originally numbered in plaintiff's submission entitled "Proposed Findings of Fact and Conclusions of Law Against Defendant George Davis Based Upon Collateral Estoppel", dated July 29, 1985, as amended.]:

2. Beginning in November 1974 Davis managed a series of embezzlements from Frigitemp [totalling over $2 million.] {Objection overruled. See Court of Appeals opinion in *U.S. v. Davis*, 767 F.2d 1025 (2d Cir.1985).}

6. In return for the award of these subcontracts, Frigitemp paid $2.7 million in kickbacks to two [key] executives of General Dynamics responsible for approving the award of the subcontracts: P. Takis Veliotis, President and General Manager of QSD until 1977 and General Manager of EB after 1977, and James H. Gilliland, Veliotis' principal assistant at Quincy Shipbuilding Division of General Dynamics. {sustained}

7. In early to mid-1973, Davis, who was a Vice President of Frigitemp's Marine Division, advised Mervyn Silver, then Executive Vice President of Frigitemp, and Gerald Lee, Frigitemp's Chairman and Chief Executive Officer, that Davis believed that Frigitemp could obtain the subcontracts if they agreed to "kick back" a [sizeable] portion of the proceeds to Veliotis and Gilliland. {objection overruled}

8. [Davis negotiated directly with Veliotis and Gilliland at Quincy, reporting back periodically to Lee and Silver at Frigitemp's headquarters in New York.] After many discussions {in which Davis was a participant} involving the amount of the kickbacks, the method of payment and the value of the contracts to be awarded, it was eventually agreed that the best vehicle for the kickback scheme was for payment to be made through a "consultant", who would bill Frigitemp for "consulting" services. These funds would then be used for the payment of kickbacks. Davis suggested that this function be performed by Sukhamay Bose, an accountant in Montreal who had performed service for Brading Equipment Sales, Ltd., ("Brading"), a marine supply company partially owned by Davis in Montreal. {overruled as modified}

11. Davis organized and supervised the laundering of the kickback fund through an elaborate network of bank accounts in the United States, Canada, the Cayman Islands and Switzerland, and carried out the actual payment of the kickbacks through a series of wire transfers to secret numbered Swiss bank accounts of Veliotis and Gilliland.* {overruled}

12. Davis routinely obtained from Veliotis and Gilliland information concerning the level of competitors' bids and the level at which the contracts would ultimately be awarded. With respect to the "joiner" contract, Frigitemp used this information to repeatedly lower its price proposals in order to be competitive with the bids of other suppliers. Veliotis and Gilliland, among others, approved the award of the joiner contract to Frigitemp in August 1974, [despite the fact that the purchasing department at QSD had recommended another supplier. {overruled}

13. With regard to the insulation contracts Lee and Silver agreed to Davis's proposal that Frigitemp accept the insulation contract [for $26 million,] and "kick

* Davis did not object to existing language but asks that the existing language be amended to state that "S. Bose also participated in the payments through wire transfers as was set forth in Finding No. 26."

back" [approximately $4 million] to Veliotis and Gilliland. {overruled}

14. In January 1975, General Dynamics, with the approval of Veliotis and Gilliland, approved Frigitemp as the subcontractor for the cargo tank insulation contract for the first three ships, well before the closing date for receipt of bids from other subcontractors by Quincy Shipbuilding Division. {overruled}

27. [Dozens of] such transfers were made to Veliotis and Gilliland, [amounting to $1,350,000 each.] {overruled}

29. In the course of carrying out the kickback scheme, Davis secretly diverted [nearly half of the $5 million fund] to himself. {overruled}

30. In 1977, Davis and Bose set up a new Cayman company called Mamoni Shipping Co., Ltd., which was used to purchase, renovate and operate cargo ships in the Far East. [Some funds embezzled from Frigitemp were laundered through Mamoni]. {sustained}

31. In October 1977, General Dynamics awarded Frigitemp contracts for tank insulation work and joiner on an additional two ships. The insulation contract was approved [by General Dynamics Headquarter offices] {overruled} on the recommendation of Veliotis and Gilliland [despite objections raised by Quincy Shipbuilding Division's purchasing department that Frigitemp's pricing was exorbitant.] {sustained} The insulation contract was awarded at a price of $10 million, and the joiner contract for $2.3 million. Again, Lee and Silver agreed with Davis that kickback payments of $2 million per ship would continue to be made to Veliotis and Gilliland. Immediately after his approval of these contracts, Veliotis left Quincy to become the General Manager of the General Dynamics Electric Boat Shipyard.

36. Veliotis and Gilliland and others at General Dynamics, [including David S. Lewis, Chairman of the Board,] approved the transaction whereby General Dynamics terminated its contracts with Frigitemp and re-awarded the same contracts in the name of IDT. {overruled}

38. Once IDT began receiving periodic progress payments from General Dynamics on the contracts, Davis resumed the wire transfers to Veliotis and Gilliland's Swiss accounts. {overruled}

39. Davis obtained over $10 million in profits from his assumption of the General Dynamics contracts, profits which should have benefited the Frigitemp estate either through continued performance under reorganization, or through outright sale to an outside contractor. {overruled}

40. As part of the conspiracy and the pattern of racketeering activities, and the Bankruptcy Fraud, Davis and his co-conspirators transferred to his own company (IDT) the highly profitable General Dynamics contracts, [concealing the property, assets and contractal rights of Frigitemp from the trustee in bankruptcy and the Bankruptcy Court, and concealed from the trustee and the Bankruptcy Court the fraudulent embezzlement and diversion of Frigitemp funds and the fraudulent payment of kickbacks.] {sustained}

41. [General Dynamics] submitted certain claims to the United States Maritime Administration for Construction Differential Subsidy Payments for certain of the LNG vessels. These claims or subsidies were based on fraudulent progress billing by Frigitemp needed by Frigitemp to pay the costs of the kickbacks.** {overruled}

42. Davis and others, known and unknown, caused the filing of these false and ficticious claims to the United States Maritime Administration. [These claims were falsely inflated as a result the kickbacks to Veliotis and Gilliland.]** {sustained}

43. Based upon findings 1–42, *supra*, at some time on and between January 1, 1973 and September 6, 1983, George Davis together with other persons unlawfully, will-

** Defendant Davis now also objects to Findings 41 and 42 on the ground that the MARAD transactions are irrelevant to the Trustee's claims as set forth in the Amended Complaint and furthermore there is no identity of issue.

fully and knowingly, combined, conspired and agreed together to violate 18 U.S.C. § 1962(c), that is, being employed by and associated with an enterprise engaged in, and the activities of which interstate and foreign commerce, to conduct and participate in the conduct of the affairs of such enterprise through a pattern of racketeering activity. {overruled}

44. Based upon findings 1–42, *supra*, at some time on or between January 1, 1973 and September 6, 1983, there existed an enterprise as defined in 18 U.S.C. § 1961(4) including Davis and at least one or more of the following: P.T. Veliotis, James Gilliand, Gerald Lee, S, Bose, General Dynamics, Frigitemp, Zucon Machinery Supply Co., Zythiel Machinery Supply Co., Typhont Machinery Supply Corp., Brading Equipment Sales, Ltd., Fintracon International Ltd., Cryginic Insulation Co. Ltd., IDT Corp., and Mamoni Shipping Co., Ltd., and others known and unknown. {overruled except to excise Mamoni Shipping Co., Ltd., which was not listed as one of the alleged members of the enterprise}

45. The purposes of the enterprise included the fraudulent embezzlement and diversion of Frigitemp funds through the payment, pursuant to fictitious contracts and invoices, illicit kickbacks to defendants Veliotis and Gilliland, fraudulent conveyance and concealment of the assets and property of Frigitemp from the Trustee in Bankruptcy of Frigitemp and the United States Bankruptcy Court for the Southern District of New York, all of which are described more fully in ¶¶ 1 to 42, *supra*. {overruled as corrected}